UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARDINAL GLASS INDUSTRIES, INC. and CARDINAL IG COMPANY,

Plaintiffs,

-v.-

NEVILLE PETERSON LLP and JOHN M. PETERSON,

Defendants.

25 Civ. 6227 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiffs Cardinal Glass Industries, Inc., and Cardinal IG Company (collectively, "Cardinal" or "Plaintiffs") bring this suit against their former attorney, John M. Peterson, and the law firm Neville Peterson LLP (the "Firm" and, collectively with Peterson, "Defendants") for legal malpractice and breach of contract in connection with Defendants' provision of tariff-related legal services. In brief, in 2018, as part of a bid to protect domestic industry, President Trump imposed tariffs on various imported steel products. Where affected parties could demonstrate a need to import the products from abroad, however, they could apply for tariff exclusions and/or refunds, in a process administered by the U.S. Department of Commerce ("Commerce").

In May 2021, Plaintiffs, a Minnesota-based manufacturer of glass for residential homes, engaged Defendants as their legal representatives to apply for and prosecute the tariff exclusion applications. While this effort was ultimately successful in obtaining exclusions on applications first filed in May 2022, Plaintiffs allege that exclusions should have been obtained much

earlier — presumably at or near the beginning of Defendants' representation. Plaintiffs claim that Defendants' negligence caused this gap, which they allege resulted in millions of dollars of missed exclusions and/or refunds.

Now before the Court is Defendants' motion to dismiss the First Amended Complaint (or "FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court grants in part and denies in part Defendants' motion.

## BACKGROUND[1]

### A. Factual Background

#### 1. The 2018 Tariff Program

Tariffs are a government tax that a party pays when it imports goods from abroad. (*See* FAC ¶ 9). By statute, Congress has authorized the President to impose tariffs in certain circumstances. (*Id.* ¶ 10). One such authorization is Section 232 of the Trade Expansion Act of 1962, which enables the President to restrict the import of goods (including through tariffs) to safeguard national security. *See Fed. Energy Admin.* v. *Algonquin SNG, Inc.*, 426 U.S. 548, 550-51 (1976).

---

[1] This Opinion draws its facts from the First Amended Complaint ("FAC" (Dkt. #33)), the well-pleaded allegations of which are taken as true for purposes of this Opinion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #37); to Plaintiffs' memorandum of law in opposition to Defendants' motion as "Pl. Opp." (Dkt. #40); and to Defendants' reply memorandum of law as "Def. Reply" (Dkt. #43). The Court also relies on certain exhibits to the FAC (cited using the convention "Ex. [ ]"), which are attached to and incorporated by reference in the FAC. *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

Pursuant to Section 232, President Trump imposed tariffs on various steel products in 2018. (FAC ¶ 11). Recognizing that the tariffs might negatively affect domestic businesses that depended on imported products because no domestic alternative existed, the tariff program included an exception: Upon application by the affected party, Commerce could exclude products if they were "determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality." (*See id.* ¶ 12 (quoting Proclamation No. 9705, 83 Fed. Reg. 11625 (Mar. 15, 2018)).

As noted, Commerce was the administrative entity responsible for reviewing and deciding Section 232 exclusion applications. (FAC ¶ 13). It did so pursuant to a set of governing regulations, which it explained colloquially to the public through a guide of frequently asked questions (the "FAQs"). (*Id.* ¶ 14 (citing 15 C.F.R. Pt. 705, Supp. 1)). Each application was standardized, requiring a product code (referred to as a "Harmonized Tariff Schedule" (or "HTS") number), a product description, and the affected party requesting the exclusion. (*See* FAC ¶¶ 16, 81).

While Commerce administered the exclusion application process, the tariffs were actually collected by a different government agency — U.S. Customs and Border Protection ("CBP") — when the goods entered the U.S. (FAC ¶ 17). If the importer presented CBP with proof of an approved exclusion, it did not have to pay the tariff. (*Id.* ¶ 19). If the importer applied for, but had not yet received, an exclusion, the importer paid the tariff to CBP but could claim a refund if the application was later granted. (*Id.* ¶ 20). This principle of

retroactivity was limited, however: As a matter of course, the right to receive a refund expired 314 days after the date of entry. (*See id.* ¶¶ 20-21).[2] Accordingly, importers who ultimately obtained an approved exception could apply for and receive refunds retroactive to the application date, subject to the ordinary course 314-day "liquidation" limit. (*See id.* ¶¶ 21-22, 24-26).

The 314-day liquidation limit became especially consequential when an application contained substantive errors. In that situation, an applicant was required to withdraw the application, and thus the applicant would not receive a refund retroactive to the original submission date. (FAC ¶ 31). By contrast, applications with non-substantive errors could simply be "re-submitted," and the applicant would enjoy the benefit of a retroactive refund to the date of the original filing. (*Id.* ¶ 29). Thus, a reasonable importer would prefer resubmission over withdrawal and, where the latter was required, reapply as soon as possible in order to maximize the number of refund-eligible imports. (*See id.* ¶¶ 31, 36-37). By extension, competent trade lawyers would understand and act on these incentives, including by familiarizing themselves with the Commerce regulations and FAQs and by advising their clients of these constraints. (*See id.* ¶¶ 15, 23, 32-34, 38).

**2. Cardinal Engages Defendants to Seek Tariff Exclusions**

Plaintiffs are a Minnesota-based manufacturer of residential glass for windows and doors. (FAC ¶ 1). Defendants specialize in international and

[2] CBP could extend this deadline *sua sponte*, or the importing party could request an extension. (FAC ¶ 21). CBP's decision was final and binding, subject to the importer's right to protest within 180 days of the decision. (*Id.*).

domestic trade law. (*Id.* ¶¶ 1, 45). Plaintiffs engaged Defendants to pursue tariff exclusions in May 2021, when a supply chain disruption forced Plaintiffs to shift purchasing from domestic to foreign steel sources. (*Id.* ¶¶ 1, 41-44).

Earlier that spring, one of Plaintiffs' domestic steel suppliers, ATI Flat Rolled Products LLC ("ATI"), had an employee strike. (FAC ¶ 41). Left "without a sufficient and reasonably available domestic source of steel," Plaintiffs filled the gap with steel from foreign suppliers. (*Id.* ¶¶ 42-43). Facing imminent tariff liability, Plaintiffs hired Defendants "as attorneys to provide legal advice on the tariff exclusion process and to file appropriate exclusion applications with the Department of Commerce and pursue available tariff refunds from the CBP." (*Id.* ¶ 44).

Defendants touted the services they could provide, and the value they could add, in a May 7, 2021 letter to Plaintiffs. (*See* FAC ¶ 108; Ex. A (the "May 7 Letter" or the "Letter") at 1-2). The May 7 Letter explained the Section 232 tariff exclusion process, noting that "[s]ome 180,000 exclusion requests have been filed to date, and approximately 70% have been approved." (Ex. A at 1). The Letter further stated that "an exclusion may be applied retroactively, to obtain refunds of duty on past entries of the product in question (so long as the subject Customs entries have not been liquidated and made final)." (*Id.*). And it promised that if Plaintiffs "provide [Defendants] with the information relevant to [their] product, we can put an application for an exclusion together in short order." (*Id.* at 2). Defendants also observed that "it would appear that [Plaintiffs] ha[ve] a good case for an exclusion." (*Id.*).

Defendants did not charge for filing each exclusion application. (Ex. A at 2). Instead, Defendants charged fees incurred throughout the process of "prosecut[ing]" the application, which fees, in their experience, could "run between $6[,]000 and $12,000, depending upon the level of opposition received." (*Id.* at 2-3). In this context, "opposition" refers to possible objections from members of the public or other U.S. suppliers, which objections could require Commerce to conduct a longer application review. (*See* FAC ¶ 94). Defendants imply in the May 7 Letter that opposition is the main obstacle to receiving an exclusion, and thus the major driver of attorney costs, noting that the Firm "independently confirms all tariff classifications for the product before submitting an application (because nothing's worse than getting a tariff-specific exclusion from Commerce and having Customs tell you that you can't use it)." (Ex. A at 2). In marketing their services, Defendants claimed that their total fees were "generally nominal compared to cost savings achieved" by avoiding the tariffs. (*Id.* at 3).

**3. Defendants' Alleged Negligence**

"Early in the engagement," Plaintiffs provided Defendants "with any requested and required information," including "detailed specification information about the products Cardinal was planning to import," so that Defendants could "prepare and file tariff exclusion applications." (FAC ¶ 46). Plaintiffs also allegedly informed Defendants "about the imminent timing of its expected import shipments." (*Id.* ¶ 47). Yet, Plaintiffs' first successful application was not filed until on or about May 31, 2022. (*See id.* ¶¶ 77, 83).

Importantly, Defendants are alleged to have advised Plaintiffs "that refunds could be obtained retroactively on any customs entries that had not yet been finally liquidated." (FAC ¶ 49). As described above, that statement is incorrect — "retroactive refunds are available only from the date on which an appropriate application is filed with the Department of Commerce." (*Id.* ¶ 50). Perhaps based on that misunderstanding, Defendants "never filed any tariff exclusion applications for Cardinal in 2021." (*Id.* ¶ 63; *see also id.* ¶ 58). In support of this allegation, Plaintiffs claim that "in 2023-2024," Defendants "admitted that they were unable to find any proof" of 2021 exclusion applications. (*Id.* ¶ 59). Later, in 2024, Plaintiffs allegedly confirmed Defendants' admission via Freedom of Information Act requests to Commerce, which requests revealed that Defendants "filed numerous exclusion applications in the relevant 2021 period (including some that were withdrawn) — but none were filed for Cardinal." (*Id.* ¶¶ 60-61 (emphasis omitted)).

In the alternative, Plaintiffs allege that Defendants filed exclusion applications in 2021, but that those applications had to be withdrawn and were therefore ineffective. Per Plaintiffs, Defendants indicated that they had filed exclusion applications starting in "early June 2021" and that they ultimately "submitted three separate tariff exclusion applications in 2021 — one for each of three separate HTS-code products." (FAC ¶¶ 57, 65). According to Plaintiffs, Peterson subsequently claimed that "for two of the three applications," the HTS codes on the exclusion applications did not match the

codes shown on the paperwork for the imports' customs entries. (*Id.* ¶ 66). Based on that error, Defendants "then purportedly withdrew all three applications," neglecting to advise Plaintiffs of the withdrawal or its implications. (*See id.* ¶¶ 69-73). Despite these issues, Defendants "continuously represented Cardinal with respect to the relevant tariff exclusions and customs entries through around February 2025." (*Id.* ¶ 77).

Thus, Plaintiffs allege that imports occurring before the May 31, 2022 applications were not eligible for exclusions or refunds, either because the applications were not filed or because they were withdrawn. (*See* FAC ¶¶ 84-85, 87). In contrast, imports starting on or about May 31, 2022, were eligible, as the May 31, 2022 applications were ultimately accepted. (*Id.* ¶¶ 81-83). The accepted applications allegedly bore "the same HTS codes" as the pre-May 2022 imports, were necessitated by the same extenuating circumstances, and received no objections. (*See id.* ¶¶ 89-91, 96).

Plaintiffs further claim that similarly situated importers obtained tariff exclusions in 2021, while Plaintiffs did not because of the never-filed or withdrawn applications. (*See* FAC ¶ 94 ("[N]umerous other U.S. companies obtained tariff exclusions in 2021" "for products with the same HTS codes as those Cardinal was importing, by citing the strike at ATI as the reason for the lack of a sufficient and reasonably available source of domestic supply (the same strike that caused Cardinal to lack a sufficient and reasonably available source of domestic supply), and by proposing to acquire the steel from one of the same foreign suppliers as Cardinal.")). Plaintiffs also assert that "a CBP

representative informed Peterson, in or around March 2024, that Cardinal's customs entries pre-dating the May 2022 application date would have been eligible for refunds but for the lack of a filed exclusion application with an earlier filing date." (*Id.* ¶ 93).

Plaintiffs ultimately allege that the missed pre-May 31, 2022 applications resulted in "over approximately $5.3 million" of tariffs that "would have" been refunded or excluded but for Defendants' alleged failure to file the applications. (FAC ¶¶ 87-88).[3]

**B. Procedural Background**

Plaintiffs commenced this action on July 29, 2025. (Dkt. #1). The operative Complaint was filed on February 25, 2026, and alleges legal malpractice (Count I) and breach of contract (Count II). (Dkt. #33). Defendants moved to dismiss the FAC on March 20, 2026. (Dkt. #35-37). Plaintiffs submitted their opposition on April 17, 2026. (Dkt. #40). Defendants replied on May 8, 2026. (Dkt. #43).

---

[3] Elsewhere, Plaintiffs allege that Defendants "missed the deadlines to file protests for over a dozen customs entries, further precluding Cardinal from obtaining refunds of over $400,000 on those specific entries." (FAC ¶ 79). These absent protests were intended to prevent the pre-May 31, 2022 imports from being "fully liquidated," *i.e.*, rendered definitively ineligible for refund, while the May 31, 2022 applications were pending. (*See id.* ¶¶ 20-21, 78). Any alleged damages stemming from this conduct, however, appear incompatible with Plaintiffs' overarching argument that the pre-May 31, 2022 imports were ineligible given Section 232's limited retroactivity. *See infra,* Discussion B.1. Accordingly, the Court does not credit this claim.

## DISCUSSION

### A. Applicable Law

Defendants seek dismissal of Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. When considering such a motion, a court "draw[s] all reasonable inferences in [a plaintiff's] favor, assume[s] all well-pleaded factual allegations to be true, and determine[s] whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009). A plaintiff is entitled to relief if it alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). Nevertheless, the court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Smith* v. *Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)). Indeed, a plaintiff must do more than provide a "formulaic recitation of the elements of a cause of action" — that is, its "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Additionally, "[i]n considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC*

*Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see generally United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).

## B. Analysis

### 1. Plaintiffs Have Stated a Claim for Legal Malpractice

Plaintiffs allege that Defendants committed legal malpractice because, *inter alia*, Defendants either failed to file or failed to prosecute tariff refund and exclusion applications on Plaintiffs' behalf before May 31, 2022. (*See* FAC ¶ 1). To state a claim for legal malpractice under New York law, a plaintiff must adequately allege "'[i] that the attorney was negligent, [ii] that the negligence was a proximate cause of the injury[,] [iii] and that [the plaintiff] suffered actual and ascertainable damages.'" *Judd Burstein, P.C.* v. *Long*, No. 15 Civ. 5295 (KPF), 2017 WL 3535004, at *6 (S.D.N.Y. Aug. 16, 2017) (quoting *Rubens* v. *Mason*, 527 F.3d 252, 254-55 (2d Cir. 2008)), *aff'd*, 797 F. App'x 585 (2d Cir. 2019) (summary order).[4] A plaintiff demonstrates negligence by showing that

---

[4] Because subject matter jurisdiction in this case is based upon diversity of citizenship (*see* FAC ¶ 7), the Court applies the choice of law rules of the forum state, *see Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). New York choice of law rules mandate application of the substantive law of the state with the most significant relationship to the legal issue. *See, e.g.*, *Skaff* v. *Progress Int'l, LLC*, No. 12 Civ. 9045 (KPF), 2014 WL 5454825, at *8 (S.D.N.Y. Oct. 28, 2014) (quoting *Intercontinental Plan., Ltd.* v. *Daystrom, Inc.*, 24 N.Y.2d 372, 382 (1969)). For tort claims, including legal malpractice and breach of contract, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *See Negri* v. *Friedman*, No. 14 Civ. 10233 (GHW), 2017 WL 2389697, at *3 (S.D.N.Y. May 31, 2017) (quoting *Cooney* v. *Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993)); *Wolfson* v. *Moskowitz*, No. 08 Civ. 8796 (DLC) (JCF), 2009 WL 1515674, at *5 (S.D.N.Y. June 1, 2009) ("In a legal malpractice case, New York's interest is predominant when the attorney being sued is licensed in New York and the underlying trial took place in New York."). Thus, New York has the greatest interest in

the attorney "failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession." *Rohe* v. *Bertine, Hufnagel, Headley, Zeltner, Drummon & Dohn, LLP*, 160 F. Supp. 3d 542, 548 (S.D.N.Y. 2016) (quoting *Rudolf* v. *Shayne, Dachs, Stanisci, Corker & Sauer*, 8 N.Y.3d 438, 442 (2007)).

Given the constraints of Rule 12(b)(6), Defendants wisely do not dispute the first element of Plaintiffs' legal malpractice claim, *i.e.*, that they were negligent. (*See generally* Def. Br.; Def. Reply). Nor do they dispute that the parties had an attorney-client relationship pursuant to which Defendants agreed to provide legal advice concerning tariff exclusion applications and to file such applications. (*See id.*). Accordingly, the Court will focus its analysis on the contested issues: proximate cause and damages.

**a. Plaintiffs' Causation Allegations Are Sufficient to State a Claim**

To establish proximate cause in the legal malpractice context, a plaintiff "must demonstrate that a reasonable fact-finder could conclude that a 'reasonable fact-finder in the underlying suit would have arrived at a different result but for the attorney's negligence.'" *Rubens*, 527 F.3d at 255 (quoting *Rubens* v. *Mason*, 387 F.3d 183, 189 (2d Cir. 2004)). Courts often describe this inquiry as the "case within a case" requirement because to evaluate the case at

---

this litigation because (i) Peterson is licensed to practice law in New York and is a citizen of New York, (ii) the Firm is a New York limited liability partnership with offices in New York, and (iii) Defendants' representation in the underlying tariff exclusion matter allegedly occurred in New York. (*See* FAC ¶¶ 1, 5-6, 8, 102). Accordingly, the Court will apply New York law to Plaintiffs' claims.

hand, the court must necessarily assess the merits of the underlying legal matter. *See, e.g.*, *Riker* v. *Premier Cap., LLC*, No. 15 Civ. 8293 (ALC), 2016 WL 5334980, at *9-10 (S.D.N.Y. Sep. 22, 2016).

At the motion to dismiss stage, a plaintiff "need only allege, not prove, the proximate cause element of the legal malpractice claim." *Reid* v. *Sack*, No. 20 Civ. 1817 (VM), 2021 WL 100490, at *4-5 (S.D.N.Y. Jan. 12, 2021) (finding dismissal "premature" because "the Complaint makes plausible allegations that [the plaintiff] *may* have recovered damages" (emphasis added) (citation omitted)); *see Teman* v. *Zeldes Needle Cooper LLP*, No. 24 Civ. 9830 (LJL), 2025 WL 3778680, at *5 (S.D.N.Y. Dec. 31, 2025) ("In other words, at this pre-discovery stage, a plaintiff need only plead allegations from which damages attributable to defendant's conduct might be inferred." (internal quotation and brackets omitted)). Even so, "[t]he question of whether a pleading sufficiently alleges proximate cause ... is appropriately considered by the court on a motion to dismiss." *Henkel* v. *Wagner*, No. 12 Civ. 4098 (AJN), 2013 WL 12084503, at *6 (S.D.N.Y. Mar. 18, 2013).

While "mere speculation of a loss resulting from an attorney's alleged [negligence] is insufficient," a plaintiff may sustain a prima facie case by showing a "likelihood of success absent [the] misconduct." *See Riker*, 2016 WL 5334980, at *9-10 (citations omitted). Thus, the plaintiff must "allege that, but for the defendant attorney's failure to exercise ordinary reasonable skill and knowledge, there would have been a more favorable outcome in the underlying proceeding." *Stein* v. *Chiera*, 14 N.Y.S.3d 133, 136 (2d Dep't 2015) (citation

omitted). However, "it is not necessary to demonstrate sole causation in order to demonstrate proximate or but-for causation." *Smartix Int'l Corp.* v. *Garrubbo, Romankow & Capese, P.C.*, No. 06 Civ. 1501 (JGK), 2009 WL 857467, at *4 (S.D.N.Y. Mar. 31, 2009) (citing *Barnett* v. *Schwartz*, 848 N.Y.S.2d 663, 668 (2d Dep't 2007)); *see, e.g.*, *Protostorm, LLC* v. *Antonelli, Terry, Stout & Kraus, LLP*, 834 F. Supp. 2d 141, 158-59 (E.D.N.Y. 2011) (finding prima facie case established where defendant was hired to file and prosecute patent application, and its alleged "lapses were a substantial cause of the abandonment of the patent application").

To ascertain whether Plaintiffs' claims satisfy the "case within a case" requirement, then, the Court must determine whether their underlying tariff reimbursement claims are cognizable. *See Judd Burstein, P.C.*, 2017 WL 3535004, at *7-8 (granting motion to dismiss because plaintiff did not "plead with particularity *any* facts" about the underlying claims (emphasis added)). Where the underlying claims would have failed notwithstanding the alleged negligence, the legal malpractice claim must also fail. *See, e.g.*, *id.*; *Dondero* v. *Chopra & Nocerino LLP*, No. 21-1487-cv, 2022 WL 320967, at *2 (2d Cir. Feb. 3, 2022) (affirming dismissal of legal malpractice claim where there was "no indication in the record — even favorably construed for the [p]laintiff —" that but for the alleged negligence, the underlying legal outcome would have been different).

Accordingly, Plaintiffs must show that their pre-May 31, 2022 applications would have had "a likelihood of success" in obtaining exclusions

and/or refunds, had they been filed or pursued to completion. *See Riker*, 2016 WL 5334980, at *9; *Russo* v. *Feder, Kaszovitz, Isaacson, Weber, Skala & Bass, LLP*, 750 N.Y.S.2d 277, 281 (1st Dep't 2002) (observing that it is plaintiff's burden to "demonstrate his or her own likelihood of success; absent such a showing, counsel's conduct is not the proximate cause of the injury").

As a starting point, Plaintiffs assert that, like the post-May 31, 2022 applications that were granted, the pre-May 31, 2022 applications would have been eligible because (i) "[b]eginning in the spring of 2021 and as a result of the ATI strike, [Plaintiffs] lacked a domestic supply of the relevant steel products that was available in a sufficient and reasonably available quantity and of a satisfactory quality" and (ii) the imports "presented no national security concerns." (FAC ¶¶ 89-90). Beyond the same extenuating circumstances, the pre-May 31, 2022 applications also allegedly involved the same products for which Plaintiffs ultimately obtained refunds. (*Id.* ¶ 91 (alleging that Plaintiffs ultimately obtained refunds on "products bearing the same HTS codes as the products for which Cardinal paid the $5.3 million in tariffs at issue in this case")).

Beyond these commonalities, Plaintiffs also allege that "a CBP representative informed Peterson, in or around March 2024, that Cardinal's customs entries pre-dating the May 2022 application date would have been eligible for refunds but for the lack of a filed exclusion application with an earlier filing date." (FAC ¶ 93). And Plaintiffs raise additional allegations that "numerous" "similarly situated" U.S. companies "obtained tariff exclusions

from Commerce in the relevant 2021 time period." (*Id.* ¶¶ 94-95). Finally, Plaintiffs note Defendants' claim in the May 7 Letter that approximately 70% of the roughly 180,000 exclusion requests then received had been approved. (Ex. A at 1). Importantly, in the same letter, Defendants commented that "it would appear that [Plaintiffs] ha[ve] a good case for an exclusion." (*Id.* at 2).

Against these allegations, Defendants emphasize the "high bar to attorney malpractice liability, [which] seeks to insure a tight causal relationship exists between the claimed injuries and the alleged malpractice, and demands a nexus between loss and injury." (Def. Br. 7 (quoting *Flutie Bros.* v. *Hayes*, No. 04 Civ. 4187 (DAB), 2006 WL 1379594, at *5 (S.D.N.Y. May 18, 2006) (internal quotation omitted))). Defendants argue that this standard is not met here because Plaintiffs' alleged injuries "are based on the sheer speculation that a third party would have exercised its discretion as the plaintiff had hoped." (Def. Br. 9). In short, Defendants assert that because the President and Commerce purportedly have "unfettered discretion" over Section 232, "*any* assertion that an earlier-filed application would have been approved is inherently conclusory and speculative." (*Id.* at 10 (emphasis added)). This argument proves too much.

In support of their contention that no legal malpractice claim can lie for Section 232-related representations, Defendants can point only to authority describing Section 232's general administrative scheme. (*See* Def. Br. 10-11; Def. Reply 5-6). Unsurprisingly, the Court draws little guidance from those inapt cases. *See, e.g.*, *Universal Steel Prods.* v. *United States*, 495 F. Supp. 3d

1336, 1342-43 (Ct. Int'l Tr. 2021) (deciding whether an administrative report produced pursuant to Section 232 is "reviewable, final agency action" that "invalidates subsequent Presidential action"); *VoestAlpine USA Corp.* v. *United States*, 578 F. Supp. 3d 1263, 1276-79 (Ct. Int'l Tr. 2022) (finding that court-ordered reliquidation of customs entries was not an appropriate remedy where Commerce erroneously approved exclusions based on invalid HTS numbers); *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S.* v. *United States*, 63 F.4th 25, 27 (Fed. Cir. 2023) (concluding that a "particular [Section] 232 duty" "[wa]s a 'United States import dut[y]' under 19 U.S.C. § 1677a(c)(2)(A)"); *Thyssenkrupp Materials NA Inc.* v. *United States*, 498 F. Supp. 3d 1372, 1376 (Ct. Int'l Trade 2021) (deciding whether an interim final rule "for importers to request exclusions from tariffs imposed on aluminum" "violates the Uniformity Clause of the Constitution").

Stating the obvious, Plaintiffs do not challenge Section 232's administrative underpinnings, nor do they challenge a specific government action made pursuant to Section 232. (*See, e.g.*, FAC ¶ 1 ("Cardinal brings this action to hold [Defendants] accountable for their serious professional and contractual breaches.")). Instead, Plaintiffs claim that but for Defendants' alleged negligence — namely, Defendants' failure to file exclusion applications with retroactive force for over a year — Plaintiffs would have obtained a better result in tariffs excluded and/or refunded. (*See id.*). Plaintiffs' allegations easily surpass this threshold.

Because the case within a case requirement obligates the Court to assess a counterfactual, while Plaintiffs may not simply "plead in conclusory form" that the underlying action was meritorious, they also "need not prove [the] underlying claim." *Teman*, 2025 WL 3778680, at *5 (citing *DePalma* v. *Maya Murphy, P.C.*, No. 16 Civ. 8933 (WHP), 2017 WL 5991783, at *5 (S.D.N.Y. Dec. 1, 2017) (allowing claim for legal malpractice in the face of defense argument "that it is unknowable" whether defendant's actions negatively affected plaintiff)). Instead, Plaintiffs need only "allege[] facts to support the allegation that the claims in the [u]nderlying [a]ction were meritorious." *Teman*, 2025 WL 3778680, at *5.

Courts in this District have found that such facts include allegations that at the time the defendants assumed the representation, they indicated that the claim was meritorious. *See, e.g.*, *Teman*, 2025 WL 3778680, at *5; *Henkel*, 2013 WL 12084503, at *6-7 (finding proximate cause established where defendants advised plaintiff that claims would be meritorious and made similar representations to judge in the underlying action), *aff'd*, 553 F. App'x 106 (2d Cir. 2014) (summary order); *cf. Baker* v. *Dorfman*, No. 97 Civ. 7512 (DLC), 1998 WL 642762, at *5-6 (S.D.N.Y. Sep. 17, 1998) (granting plaintiff's motion for summary judgment on legal malpractice claim and finding proximate cause established, in part because defendant had admitted the claims had "some" value (estimating that value at $15,000) and plaintiff had obtained "favorable testimony" from one individual to help prove the claims).

Another factor supporting a finding that the underlying claim was meritorious is the plaintiff's ultimate success in pursuing the sought-after relief. *See Ofman* v. *Tenenbaum Berger & Shivers, LLP*, 191 N.Y.S.3d 730, 732 (2d Dep't 2023) (finding "not impermissibly speculative or conclusory" plaintiff's allegation that defendants' delay in filing ultimately successful lawsuit "prevented [the plaintiff] from being able to collect on the judgment that was eventually entered"). Also persuasive are well-pleaded allegations that similarly situated parties received the desired relief. *See WGH Commc'ns, Inc.* v. *Penachio Malara LLP*, No. 21-570-cv, 2022 WL 569665, at *2 (2d Cir. Feb. 25, 2022) (summary order) (finding proximate cause not established, in part because pleadings did not allege that similarly situated parties "had their claims satisfied"). And the same result obtains where the factfinder for the underlying claim identifies the alleged negligence as the reason for the adverse outcome. *See Kuruwa* v. *Meyers*, 823 F. Supp. 2d 253, 258 (S.D.N.Y. 2011) (upholding legal malpractice claim in the context of inquest into damages, in part because administrative agency told plaintiff that the "only reason his application for a change in status to a temporary visitor was rejected was because it was submitted after his previous visa had expired"), *aff'd*, 512 F. App'x 45 (2d Cir. 2013) (summary order).

Each of these factors is present here. As stated above, at the time the representation commenced, Defendants told Plaintiffs that they had strong claims for exclusions. (*See* Ex. A). Defendants presumably represented as much to Commerce while prosecuting the successful post-May 31, 2022

applications. Likewise, Plaintiffs allege that CBP communicated that the pre-May 31, 2022 applications had merit. (*See* FAC ¶ 93). Finally, while Plaintiffs' "similarly situated" importers allegation is somewhat lacking in detail, it may be tested through discovery, and the Court credits it at this early stage. (S*ee id.* ¶¶ 94-95).

While the Court takes Defendants' point that the alleged common products and circumstances between the pre- and post-May 31, 2022 applications do not *guarantee* that Commerce would have accepted the earlier applications, had they been filed, the accepted applications are certainly evidence that the pre-May 31, 2022 applications were meritorious, *i.e.*, they had the requisite likelihood of success. Perhaps it will come out in discovery that there is some reason to believe that Commerce and/or the President would have exercised their "unfettered discretion" to nix tariff exclusion applications that they later approved, but the Court will not make that assumption at this stage.[5]

---

5 All the same, Defendants' "speculation" and "discretion" cases are inapposite, showing only that any plaintiffs putting forth weak or no evidence suggesting the underlying claim was meritorious will have their claims dismissed. *See, e.g.*, *Arias* v. *Kelner*, 663 N.Y.S.2d 193, 194 (1st Dep't 1997) (affirming dismissal of legal malpractice complaint for failure to plead proximate cause, where plaintiff did not explain why opposing counsel would be likely to accept "timely request for an extension to make payments under the underlying settlement agreement"); *Volpe* v. *Munoz & Assocs., LLC*, 136 N.Y.S.3d 736, 736-37 (1st Dep't 2021) (same, where plaintiff failed to allege actionable negligence); *Bua* v. *Purcell & Ingrao, P.C.*, 952 N.Y.S.2d 592, 596-98 (2d Dep't 2012) (same); *Barbieri* v. *Fishoff*, 950 N.Y.S.2d 384, 385-86 (2d Dep't 2012) (reversing denial of summary judgment decision where, prior to hiring defendant attorney who was allegedly negligent for failing to call a handwriting expert, plaintiff had already indicated to bankruptcy court that he intended not to call any experts); *Perkins* v. *Norwick*, 693 N.Y.S.2d 1, 3 (1st Dep't 1999) (dismissing legal malpractice claim where plaintiff "had absolutely no [contractual] right" to change the underlying outcome, such that it was "gross speculation" to posit that he could have renegotiated but for the alleged negligence).

Defendants' assertion that "Cardinal frames their alleged loss entirely in speculative terms" fares no better. (*See* Def. Br. 12 (arguing that Plaintiffs claim "only a forfeited opportunity to obtain refunds, a lost ability to seek exclusions, the potential to have been eligible, or a failure to secure the best chance of recovery")). Unremarkably, Plaintiffs assert that because Defendants failed to file the pre-May 31, 2022 applications, Plaintiffs could not claim tariff exclusions for those imports. (*See* FAC ¶ 1).

New York courts regularly recognize legal malpractice actions premised on such "lost" underlying claims. *See, e.g., Ofman* v. *Richland*, 225 N.Y.S.3d 679, 683 (2d Dep't 2025) (vacating dismissal of legal malpractice claim, where plaintiff alleged that defendants' negligence caused him to "lose his claims of legal malpractice against the defendant in the underlying action"); *Atlas Sanitation Co.* v. *Horowitz L. Grp., LLC*, No. 17 Civ. 283 (DLI), 2018 WL 1581973, at *4 (E.D.N.Y. Mar. 29, 2018) (denying motion to dismiss malpractice claim alleging that defendants' conduct eliminated "any and all defenses" to claims of withdrawal liability under ERISA); *Reid*, 2021 WL 100490, at *5 (denying motion to dismiss malpractice claim where plaintiff plausibly alleged that he "may have recovered damages under now time-barred theories"); *cf. Henkel*, 2013 WL 12084503, at *7 (finding proximate cause established because plaintiff alleged both that she had meritorious claims and "that she lost her ability to pursue these claims" due to defendants' negligence, but finding damages not established because the underlying action was still pending).

In *Teman*, for example, Judge Liman found the plaintiff stated a legal malpractice claim where the defendants' alleged negligence resulted in the underlying action being dismissed for failure to prosecute. *See* 2025 WL 3778680, at *2. Because the plaintiff alleged facts to support his allegation that the underlying claim was meritorious, it was plausible to infer that, "had [d]efendants not allowed [p]laintiff to default on his claim, he would have obtained a successful result either by a judgment or by settlement." *Id.* at *5. Notwithstanding that the hypothetical result was "unknowable," the plaintiff's allegation of a lost opportunity to pursue the allegedly meritorious claim was enough to survive a motion to dismiss. *See id* at *5-6.

The same is true here. Because Plaintiffs have plausibly alleged that their underlying tariff exclusion claims were meritorious and because they lost those claims due to Defendants' alleged negligence, Plaintiffs have satisfied the but for causation element.

**b. Plaintiffs' Damages Allegations Are Sufficient to State a Claim**

Defendants also argue that Plaintiffs fail "to plead the requisite actual and ascertainable damages to sustain a legal malpractice claim" because Plaintiffs have not pleaded "any non-speculative facts establishing that such refunds were required, guaranteed, or even likely." (Def. Br. 2). As Defendants' own arguments illustrate, the proximate cause and actual damages inquiries are intertwined. *See Ynoa* v. *Kutner*, No. 10 Civ. 5398 (ALC), 2015 WL 13881591, at *5 (S.D.N.Y. Mar. 30, 2015) ("The proximate cause and actual damages prerequisites require a plaintiff to 'show that but for the attorney's

negligence, what would have been a favorable outcome was an unfavorable outcome.'" (quoting *Rubens*, 387 F.3d at 189-90)).

In legal malpractice cases, "damages" refers to "the value of the claim lost." *Diamond* v. *Sokol*, No. 05 Civ. 4993 (GEL), 2007 WL 3168469, at *4 (S.D.N.Y. Oct. 29, 2007) (citing *Weil, Gotshal & Manges, LLP* v. *Fashion Boutique of Short Hills, Inc.*, 780 N.Y.S.2d 593, 595 (1st Dep't 2004)). In *Diamond*, such damages were "the elements of damages that plaintiff was allegedly precluded from proving by the defendants' failure to include them in a bill of particulars or to seek them at trial." 2007 WL 3168469, at *4. Said another way, where the underlying claim would be worth the same amount to plaintiff, irrespective of the alleged negligence, actual damages are lacking. *See Nordwind* v. *Rowland*, 584 F.3d 420, 432 (2d Cir. 2009).

The "value of the claim lost" is adequately pleaded where the plaintiff identifies a specific dollar value that approximates the value of the lost claim. *See, e.g.*, *Teman*, 2025 WL 3778680, at *6 (alleging that defendants told plaintiff that "his claim in the [u]nderlying [a]ction would warrant damages in an amount upwards of $75 million"); *Prout* v. *Vladeck*, 319 F. Supp. 3d 741, 746 (S.D.N.Y. 2018) (finding that plaintiff adequately alleged damages based on the approximate value of the lost claim); *Malta* v. *Fox Horan & Camerini, LLP*, No. 17 Civ. 3228 (JFK), 2018 WL 1276881, at *4 (S.D.N.Y. Mar. 12, 2018) (finding damages sufficiently pleaded where plaintiff identified a specific dollar value of tax liability stemming from defendants' alleged negligence). However, if the alleged value of the underlying claim is "purely speculative," as when, for

example, there is an attenuated causal chain, estimating the underlying claim's value is insufficient. *See Judd Burstein, P.C.* v. *Long*, No. 15 Civ. 5295 (KPF), 2018 WL 6067226, at *5 (S.D.N.Y. Nov. 20, 2018) ("The [amended complaint's] allegations that counsel for Parry at one point indicated that Parry would consider mediation, and that the mediation never occurred, are not enough to make the leap from speculative damages to actual and ascertainable damages."), *aff'd*, 797 F. App'x 585 (2d Cir. 2019) (summary order).

Here, Plaintiffs claim damages of "over $5.3 million in missed tariff refunds and exclusions" — tariffs that were paid but would have been avoided had the pre-May 31, 2022 applications been successfully prosecuted. (FAC ¶ 1). Contrary to Defendants' assertions, Plaintiffs' burden is not to establish a "*guarantee* of a refund from CBP in the exact amount claimed." (Def. Br. 13 (emphasis added)). Instead, Plaintiffs' allegations need only "plausibly assert" that alleged negligence placed Plaintiffs "in a worse financial position" than they would have been in but for that conduct. *Barack* v. *Seward & Kissel, LLP*, No. 16 Civ. 9664 (WHP), 2017 WL 4023141, at *6 (S.D.N.Y. Sep. 12, 2017). Cardinal's allegations easily meet this standard.

For all of these reasons, Plaintiffs have adequately alleged the elements of a legal malpractice claim against Defendants, and Defendants' motion to dismiss Count I is denied.

**2. Plaintiffs Fail to Plead a Claim for Breach of Contract**

Separately, Plaintiffs allege that Defendants breached the parties' contractual agreement by failing to "independently confirm the appropriate

tariff classifications before submitting exclusion applications." (FAC ¶ 108; *see also id.* ¶¶ 67, 109). Claims that attorneys breached a retainer contract "are regularly dismissed as duplicative of legal malpractice claims if they arise from the same facts and circumstances and do not allege distinct damages." *WGH Commc'ns, Inc.*, 2022 WL 569665, at *2 (citing *Keness* v. *Feldman, Kramer & Monaco P.C.*, 963 N.Y.S.2d 313, 315 (2d Dep't 2013) (collecting cases)).

Plaintiffs allege that because of Defendants' breach of contract, "Plaintiffs have suffered damages, including missed tariff refunds and exclusions." (FAC ¶ 111). Notably, these are the very same damages that Plaintiffs claim for Defendants' alleged negligence. (*See, e.g.*, *id.* ¶ 1 ("[Defendants] negligently gave wrong advice, failed to timely file the applications, and committed other negligent acts that cost Cardinal over $5.3 million in missed tariff refunds and exclusions.")). Further, the Court disagrees with Cardinal that the breach of contract claim arises from different facts and circumstances than the negligence claim. Indeed, Plaintiffs specifically allege that the complained-of conduct was both a breach of contract and negligent. (*See id.* ¶ 67 ("It was thus within the scope of [Defendants' contractual] duty to identify the correct HTS classifications before filing applications. [...] To the extent that [Defendants] filed exclusion applications that did not correctly identify the HTS classifications of the products, the Neville Peterson Parties were negligent in doing so.")). Because of this overlap, the breach of contract claim must be dismissed as duplicative of the legal malpractice claim. *See, e.g.*, *Henderson* v. *Sanders*, No. 18 Civ. 8473 (LTS), 2020 WL 5946455, at *2 (S.D.N.Y. Oct. 7,

2020) (dismissing breach of contract claim because it was based on the same conduct as legal malpractice claim).

Plaintiffs' argument that their "contract claim is not duplicative" because Defendants allegedly "undertook by contract to perform a specific task but failed to do so" does nothing to alter this result. (Pl. Opp. 3). As Plaintiffs' allegations explicitly concede, the HTS confirmation obligation was within Defendants' general duty of care since the HTS code is one of the main inputs to the standardized tariff exclusion application. (*See* FAC ¶ 16). And the Court discerns no relevant difference between Defendants' "promise" to confirm the HTS codes and other "promises" made in the May 7 Letter that Plaintiffs have not claimed are breaches of contract, rather than general duties of care. (*See, e.g.*, Ex. A at 2 (Defendants' commitment to "put an application for an exclusion together in short order" if Plaintiffs "provide[d] [Defendants] with the information relevant to [their] product.")). Thus, "whether framing their claim as breach of contract or attorney malpractice, plaintiffs must demonstrate the same thing, that defendants did not perform with the appropriate level of care, and that plaintiffs suffered damages as a result." *Est. of Re* v. *Kornstein Veisz & Wexler*, 958 F. Supp. 907, 921 (S.D.N.Y. 1997) (Sotomayor, J.). Accordingly, Plaintiffs' breach of contract claim is redundant and must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. The Court DISMISSES Count II with prejudice. Count I survives.

Defendants shall file an answer to the FAC on or before **December 14, 2026**. On or before **December 14, 2026**, the parties shall submit to the Court a joint letter and proposed case management plan in accordance with the specifications laid out in the Notice of Initial Pretrial Conference. (*See* Dkt. #9). If the parties wish to have a conference to discuss case management concerns, they may so request in their joint letter.

The Clerk of Court is directed to terminate the pending motion at docket entry 35.

SO ORDERED.

Dated: November 12, 2026
New York, New York

KATHERINE POLK FAILLA
United States District Judge